UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KATHY A. COMSTOCK,

                    Plaintiff,

          v.                                    **DECISION AND ORDER**
                                                    **07-CV-0989**
MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

# Introduction

1.      Plaintiff Kathy A. Comstock challenges an Administrative Law

Judge's ("ALJ") determination that she is not entitled to disability insurance

benefits ("DIB"), or supplemental security income benefits ("SSI"), under the

Social Security Act ("the Act").  Plaintiff alleges she has been disabled since

December 2, 2003, because of pain and limitations from a brain tumor,

scoliosis of the thoracic spine, migraine headaches, and diminished vision in

her right eye.  Plaintiff met the disability insured status requirements of the

Act at all times pertinent to this claim.

# Procedural History

2.      Plaintiff filed applications for DIB and SSI on November 19, 2004.

Her applications were denied initially and, under the prototype model of

handling claims without requiring a reconsideration step, Plaintiff was

permitted to appeal directly to the ALJ.  See 65 Fed. Reg. 81553 (Dec. 26,

2000).   Pursuant to Plaintiff's request, an administrative hearing was held on

November 1, 2005, before ALJ Joseph G. Medicis, Jr., at which time Plaintiff,

her sister, her attorney and two legal interns appeared.  The ALJ considered the case *de novo*, and on May 25, 2006, issued a decision finding that Plaintiff was not disabled.  On July 24, 2007, the Appeals Council denied Plaintiff's request for review.

3.     On September 21, 2007, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the decision of Defendant, and grant DIB or SSI benefits to Plaintiff.[1]  The Defendant filed an answer to Plaintiff's complaint on January 17, 2008, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Memorandum of Law (hereinafter called "Plaintiff's Brief") on February 22, 2008.  On April 7, 2008, Defendant filed a Memorandum Of Law In  Support Of The Commissioner's Motion For Judgment On The Pleadings[2] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

## Discussion

### Legal Standard and Scope of Review:

4.     A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. § 405(g), 1383

---

[1] The ALJ's May 25, 2006, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

(c)(3); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

5.     "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have

reached a different result upon a *de novo* review."  Valente v. Sec'y of Health
and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6.      The Commissioner has established a five-step sequential
evaluation process to determine whether an individual is disabled as defined
under the Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The
United States Supreme Court recognized the validity of this analysis in Bowen
v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119
(1987), and it remains the proper approach for analyzing whether a claimant
is disabled.

7.      This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently
engaged substantial gainful activity.  If he is not, the [Commissioner]
next considers whether the claimant has a "severe impairment" which
significantly limits his physical or mental ability to do basic work active-
ties.  If the claimant has such an impairment, the third inquiry is whether,
based solely on medical evidence, the claimant has an impairment
which is listed in Appendix 1 of the regulations.  If the claimant has
such an impairment, the [Commissioner] will consider him disabled with-
out considering vocational factors such as age, education, and work
experience; the [Commissioner] presumes that a claimant who is
afflicted with a "listed" impairment is unable to perform substantial gain-
ful activity.  Assuming the claimant does not have a listed impairment,
the fourth inquiry is whether, despite the claimant's severe impairment,
he has the residual functional capacity to perform his past work.  Finally,
if the claimant is unable to perform his past work, the [Commissioner]
then determines whether there is other work which the claimant could
perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also
Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8.      While the claimant has the burden of proof as to the first four steps,
the Commissioner has the burden of proof on the fifth and final step.  See

Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).

The final step of this inquiry is, in turn, divided into two parts.  First, the

Commissioner must assess the claimant's job qualifications by considering

his physical ability, age, education, and work experience.  Second, the

Commissioner must determine whether jobs exist in the national economy

that a person having the claimant's qualifications could perform.  See 42

U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461

U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.      In this case, the ALJ made the following findings with regard to

factual information as well as the five-step process set forth above: (1)

Plaintiff meets the insured status requirements of the Social Security Act

through September 30, 2007 (R. at 21);[3]  (2) Plaintiff has not engaged in

substantial gainful activity at any time relevant to this decision (20 C.F.R. §§

404.1520(b), 404.1571 et.seq., 416.920(b) and 416.971 et. seq.) (R. at 21);

(3) Plaintiff has the following severe impairments: migraine headaches and

scoliosis of the thoracic spine (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

However, her benign lipoma of the brain is not a severe impairment (R. at 22);

(4) Plaintiff does not have an impairment or combination of impairments that

meets or medically equals one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404. 1526,

416.920(d), 416.925, and 416.926) (R. at 23); (5) After careful consideration

of the entire record, the ALJ found that Plaintiff has the residual functional

capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently,

---

[3] Citations to the underlying administrative are designated as "R."

stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (R. at 24); (6) Plaintiff is capable of performing past relevant work as a cashier and hotel housekeeper.  This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity (20 CF.R. §§ 404.1565 and 416.965) (R. at 27); (7) Plaintiff has not been under a "disability," as defined in the Social Security Act, from December 2, 2003, through the date of the ALJ's decision (20 C.F.R. §§ 404.1520(f)and 416.920(f)) (R. at 27).  Ultimately, the ALJ determined Plaintiff was not entitled to a period of disability and disability insurance benefits as set forth in sections 216(i) and 223(d) of the Social Security Act (R. at 27).  Further, the ALJ found Plaintiff was not entitled to supplemental security income benefits based on disability under section 1614(a)(3)(A) of the Social Security Act (R. at 27).

## Plaintiff's Challenges

10.     Plaintiff challenges the decision of the ALJ on the basis that it is not supported by the substantial evidence of record.  Specifically, Plaintiff alleges (1) the ALJ did not give adequate consideration to the medical opinion of Plaintiff's treating neurologist, and failed to provide specific reasons in his decision for the weight he assigned to this physician's opinion, (2) the ALJ erred by concluding that Plaintiff retained the residual functional capacity to return to her past relevant work, or to engage in any substantial gainful activity on a regular and continuing basis, and (3) absent the testimony of a vocational expert, the ALJ improperly concluded that there is work Plaintiff

can perform in the national economy. Each of Plaintiff's allegations is discussed below.

> ### Plaintiff's First Challenge: The ALJ Did Not Give Adequate Consideration to the Medical Opinion of Plaintiff's Treating Neurologist

11.     Plaintiff's first challenge to the ALJ's decision is that he did not give adequate consideration to the medical evidence provided by her treating neurologist, Dr. Gaffney.  Further, Plaintiff alleges that, in his decision, the ALJ failed to explain with sufficient specificity his reasons for disregarding the doctor's February 14, 2006 answers contained in a questionnaire that, in Plaintiff's opinion, might have led to a finding of disability.  See Plaintiff's Brief, pp. 5-10.  Thus, Plaintiff asserts the ALJ's determination that she is not disabled, and retains the residual functional capacity to return to her past relevant work on a regular and continuing basis, is not based on the substantial evidence of record and must be reversed.  See Plaintiff's Brief, pp. 9-10.

According to the "treating physician's rule,"[4] the ALJ must give controlling weight to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart,

---

[4] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

No. 02-6133, 2003 WL 21545097, at *6 (2d Cir. July 10, 2003); Shaw v.

Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Even if a treating physician's opinion is deemed not to be deserving

of controlling weight, an ALJ may nonetheless give it "extra weight" under

certain circumstances.  Under  C.F.R. § 404.1527(d)(1)-(6), the ALJ should

consider the following factors when determining the proper weight to afford

the treating physician's opinion if it is not entitled to controlling weight: (1)

length of the treatment relationship and the frequency of examination, (2)

nature and extent of the treatment relationship, (3) supportability of opinion,

(4) consistency, (5) specialization of the treating physician, and (6) other

factors that are brought to the attention of the court.  See de Roman, 2003

WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2); see also Shaw, 221 F.3d

at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Having reviewed the evidence at issue, this Court detects no

reversible error in the ALJ's treatment of the opinion of Plaintiff's treating

physician, Dr. Gaffney, issued on February 14, 2006 (R. at 260-263).  Rather,

the ALJ's decision reflects his extensive evaluation of all the medical

evidence in the record developed from the date of Plaintiff's alleged disability

on December 2, 2003, through the date of the ALJ's decision on May 25,

2006 (R. at 19-27).  The medical evidence includes treatment notes,

evaluations of Plaintiff's progress, and test results (R. at 132-263). The

answers supplied by Dr. Gaffney to Plaintiff's February 14, 2006

questionnaire are inconsistent with his prior opinions and unsupported by the record as a whole.

Plaintiff's medical records document that she suffers from ailments that the ALJ determined to be severe, but not disabling, either alone or in combination (R. at 22-23).  The record shows that Plaintiff underwent an x-ray of her thoracic spine on April 14, 2000 (R. at 184).  The radiologist's impression was that she had a prominent scoliotic deformity of both the thoracic spine and upper lumbar spine.  Id.

Plaintiff was examined by her treating neurosurgeon, Dr. Barry Pollack, on October 14, 2002 (R. at 185-186).  Plaintiff reported having approximately three headaches per week, each lasting several hours (R. at 185).  Upon examination, Dr. Pollack noted Plaintiff had frontal bossing[5] and mild hypertelorism[6].  Id.  Plaintiff's memory and reasoning were intact.  Id.  Examination of Plaintiff's cranial nerves revealed a right corneal three millimeter opacification, and a bloodshot right eye.  Id.  The remainder of the cranial nerves examination was unremarkable.  Id.  Deep tendon reflexes were 1 to 2/4 and symmetrical.  Id.  There was no pronator drift, and gait, station, and tandem walk were normal.  Id.  Dr. Pollack recommended a second MRI in eight weeks (R. at 186).  He also referred Plaintiff to a neurologist, Dr. James Gaffney.  Id.

Plaintiff was examined by Dr. Gaffney on October 30, 2002, when she complained of one or two migraine headaches per week (R. at 193-194).

---

[5] Frontal bossing is an unusually prominent forehead, sometimes associated with a heavier than normal brow ridge.  See http://www.nlm.nih.gov/Medlineplus/ency/article/003301.htm.
[6] Excessive width between the eyes.  See http://ghr.nlm.nih.gov/glossary=hypertelorism.

Plaintiff's physical, neurological, and motor examination revealed mostly normal results.  Id.  Dr. Gaffney diagnosed migraine headaches without aura, and prescribed Depakote and Imitrix (R. at 194).

Plaintiff followed up with Dr. Gaffney on December 20, 2002 (R. at 195).  She reported that the Depakote and Imitrix were controlling her headaches, and that she was able to work on a more regular basis.  Id.  Plaintiff's physical, neurological, and motor examinations were unremarkable.  Id.  Dr. Gaffney recommended a follow up visit in four months.  Id.

On March 23, 2003, Plaintiff was treated for a migraine headache at the emergency room of Cayuga Medical Center at Ithaca, New York (R. at 199-206).  Plaintiff was treated with medication and released from the emergency room the same day (R. at 205-206).

A repeat MRI was performed for Dr. Pollack on April 1, 2003 (R. at 188-192).  The impression was that the one centimeter mass in the foramen of Monro[7] was stable (R. at 188).  Plaintiff's lipoma along the cerebellar vermis was also unchanged.  Id.

Plaintiff followed up with Dr. Gaffney on May 13, 2003 (R. at 196).  She reported that her headaches had increased in frequency when she stopped taking Depakote because it made her feel nauseous.  Id.  Imitrix by itself was ineffective in relieving her headaches.  Id.  Upon physical examination, Dr. Gaffney observed that Plaintiff's right eye was bloodshot and her eyelid was puffy as she was actively experiencing a headache.  Id.  The

---

[7] Foramen of Monro is defined as the opening from each lateral ventricle into the third ventricle of the brain [syn: interventricular foramen],  Merriam-Webster Medical Dictionary, 2008.

remainder of her physical, neurological, and motor examinations was
unremarkable.  Id.  The doctor prescribed Topamax at bedtime, and Imitrix to
relieve headaches.  Id.

Dr. Gaffney examined Plaintiff again on June 16, 2003 (R. at 197).
She told the doctor that she was having headaches almost every day until
she went to physical therapy sessions prescribed by Dr. Pollack.  Id.  Plaintiff
reported the physical therapist "worked on her neck and she hasn't had a
headache in the last three days at all."  Id.  Dr. Gaffney recommended Plaintiff
continue with physical therapy, Topamax and Imitrix, and undergo an x-ray
series for her spinal scoliosis.  Id.  He also gave Plaintiff a letter stating she
was periodically disabled by migraine headaches so that she could continue
receiving subsidized babysitting for her two children.  Id.

On June 16, 2003, Plaintiff underwent a scoliosis study (R. at 198).
The impression was that she had scoliosis of the thoracic spine centered at
T8-9, and levoscoliosos at L2-3 of the lumbar spine.  Id.

Dr. Pollack provided Plaintiff with a letter to DSS Childcare Services
stating that she was disabled by severe head pain and unable to work or care
for her two children in the time period from April 1, 2003 until June 23, 2003
(R. at 187).

The record shows that Plaintiff was referred by Dr. Gaffney to a
new treating physician, Dr. David Haas, on August 12, 2003, for an
assessment of her "frequent sick headaches" (R. at 161).  Plaintiff reported
severe to excruciating headaches accompanied by nausea and vomiting.  Id.

Dr. Haas noted an earlier CT scan, along with several MRIs, showed Plaintiff had a one centimeter mass near the foramina of Monro in the lateral ventricles, and the doctor stated he believed this mass to be a colloid cyst. Id.  Dr. Haas opined the cyst was not the cause of Plaintiff's headaches.  Id. Dr. Haas diagnosed Plaintiff with frequent migraine headaches without aura, and prescribed a nightly dose of amitriptyline, and sumatriptan nasal spray. Id.  He also recommended Plaintiff keep a record of her headaches.  Id.

Plaintiff was treated by Dr. Haas again on September 4, 2003, when she reported that the medication prescribed at her last visit was ineffective for controlling her headaches (R. at 162).  The doctor recommended Plaintiff increase her dose of amitriptyline to 20 milligrams nightly, and added almotriptan as a "migraine abortive."  Id.  Plaintiff was instructed to continue keeping a record of her headaches.  Id.

On October 8, 2003, Plaintiff followed up with Dr. Haas and reported her migraine headaches did not respond to the 20 milligram dosage of amitriptyline, but she obtained "fair to good relief" from the almotriptan tables (R. at 163).  The doctor increased Plaintiff's nightly dose of amitriptyline to 25 milligrams, and recommended 35 milligrams of the drug if Plaintiff tolerated the higher dosage.  Id.

Plaintiff was treated by Dr. Haas again on November 5, 2003, when she reported that the nightly 25 milligram dose of amitriptyline had been successful in preventing migraine headaches (R. at 164).  Plaintiff reported she had only one headache in the time period from October 8, 2003 to

12

November 5, 2003, and that headache was relieved by an almotriptan tablet. Id.  She told Dr. Haas she had been fully active at home with her two children, and wished to return to full-time employment.  Id.  Dr. Haas instructed Plaintiff to stay on her medication program, and if she remained well, she should return for a follow up visit in the spring.  Id.

On March 11, 2004, Plaintiff underwent another MRI of her brain to observe any changes in the hyperdense mass in the region of the anterior third ventricle and foramen of Monro (R. at 165-166).  Plaintiff's neurosurgeon, Dr. Pollack, noted the mass was stable and was likely a colloid cyst.  Id.  He also noted Plaintiff had a lipoma over the vermis of the cerebellum and chronic fluid signal intensity within the right mastoid air cells. Id.

Plaintiff underwent a follow up MRI of her brain on July 16, 2004 (R. at 167).  Dr. Pollack observed that the colloid cyst was unchanged since June 2003, and that Plaintiff's lipoma was also unchanged.  Id.

On March 4, 2005, Plaintiff was examined by State agency consulting physician, Dr. Mark Henderson (R. at 171-176).  She complained of frequent migraine headaches, pain in her thoracic spine from scoliosis, and diminished vision in her right eye from an ulcer in her cornea (R. at 171).  The examination revealed mostly unremarkable results.  Dr. Henderson observed the corrected visual acuity in Plaintiff's right eye was 20/70, but the corrected visual acuity in both eyes was 20/20 (R. at 172).  Her gait and station were normal, she could walk on her heels and toes without difficulty, her squat was

full, and she needed no assistance changing for the examination or getting on or off of the examination table.  Assessment of Plaintiff's chest and lungs showed she had a normal anterior/posterior diameter, normal diaphragmatic motion, and no significant chest wall abnormality (R. at 173).  Her lungs were clear to auscultation, and percussion was normal.  Id.  Plaintiff's cervical spine showed full flexion, extension, and bilateral rotary movement (R. at 174).  While Dr. Henderson observed the scoliosis of Plaintiff's upper thoracic spine, he noted there was no increased thoracic kyphosis.  Id.  The examination of Plaintiff's lumbar spine revealed a very mild decreased range of motion, but she had full range of motion in both her upper and lower extremities.  Id.  Strength was 5/5 bilaterally in her upper and lower extremities.  Id.  Plaintiff's neurological examination was normal as was her mental status screening.  Id.  Dr. Henderson diagnosed Plaintiff with a history of migraine headaches, a history of scoliosis, a history of right eye ulceration, and tobacco abuse (R. at 175).  In his medical source statement, the doctor opined Plaintiff would have a moderate restriction for sustained work activity because of her migraine headaches, and a mild restriction for heavy lifting and carrying.  Id.

On April 14, 2005, a State agency analyst completed a Physical Residual Functional Capacity Assessment evaluating Plaintiff as having the residual functional capacity to return to her past light work, which included jobs as a cashier, hotel housekeeper, and waitress (R. at 178-183).

Plaintiff had another MRI of her brain on July 5, 2005 (R. at 223). The colloid cyst and the benign lipoma over the right cerebellar vermis were unchanged.  Id.

On November 30, 2005, Plaintiff was examined by Dr. Gaffney for the first time in almost two and one-half years (R. at 240-241).  He noted she had seen Dr. Haas until late in 2003, and Dr. Haas reported Plaintiff obtained good relief from her migraine headaches with a daily dose of amitriptyline, and suffered no side effects from the medication (R. at 240).  Plaintiff told Dr. Gaffney that after she stopped seeing Dr. Haas, she ran out of prescription medication.  Id.  She complained of three to five headaches per week, with one or two of the headaches reaching a severe level of intensity.  Id.  Plaintiff reported her only medications were naproxen and ibuprofen.  Id.  Plaintiff's physical, neurological, and motor examinations were unremarkable, and Dr. Gaffney noted she was an "excellent detailed historian with good memory. Speech and language are unremarkable.  Patient has an adequate fund of knowledge" (R. at 240-241).  Dr. Gaffney again diagnosed Plaintiff with migraine without aura, prescribed amitriptyline and Axert, and recorded "From my perspective, she is not either permanently or totally disabled by migraines and there is certainly some chance that we can get them back under control again" (R. at 241).  On the day of Plaintiff's appointment and examination, Dr. Gaffney completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) and a Medical Source Statement of Ability to Do Work-Related Activities (Physical) (R. at 242-244, 246-249).  Dr. Gaffney assessed

Plaintiff as having no mental disabilities that would affect her ability to perform substantial gainful activity (R. at 242-244).  He further assessed Plaintiff as having no disability from migraine headaches that would affect her ability to perform substantial gainful activity, but recommended a separate review of Plaintiff's scoliosis (R. at 246-249).

Plaintiff underwent a consultative mental examination with Jed Weitzen, Ph.D. on December 1, 2005 (R. at 250-254).  Dr. Weitzen noted Plaintiff drove herself to the examination, arrived on time, and was unaccompanied by a friend or relative (R. at 251).  Plaintiff reported she was independent in her activities of daily living, and a typical day included "caring for her children, cleaning up at home, food shopping, cooking, doing laundry, using the telephone, and seeing her friends" (R. at 254).  Dr. Weitzen observed Plaintiff's language skills and hearing were intact (R. at 252).  On a standardized intelligence test, she scored in the low average range (R. at 253).  Dr. Weitzen concluded Plaintiff had no mental disorder with "essentially unremarkable low average cognitive functioning" (R. at 254).

Based on the results of Plaintiff's mental examination, Dr. Weitzen completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on January 6, 2006 (R. at 255-257).  He assessed Plaintiff as having slight difficulties in the areas of interacting appropriately with the public, interacting appropriately with supervisors, and interacting appropriately with co-workers, and moderate difficulties in the areas of responding appropriately to work pressures in a usual work setting, and responding

appropriately to changes in a routine work setting (R. at 256).  Dr. Weitzen

supported his assessment by noting that because of Plaintiff's limited overall

IQ, she would "have more problems functioning effectively as work demands

become more challenging."  Id.

Plaintiff was examined by Dr. Pollack on January 6, 2006, as a

follow up for her colloid cyst and lipoma (R. at 258).  Her neurological and

motor examinations were unremarkable. Id.  The doctor noted the colloid cyst

and lipoma were unchanged in size from prior examinations, and he

recommended Plaintiff undergo a new MRI examination in 18 months.  Id.

On February 14, 2006, Dr. Gaffney answered a series of written

questions posed to him by Plaintiff's attorney (R. at 260-263).  He assessed

Plaintiff as having chronic intermittent headaches that caused severe pain,

nausea or vomiting, and photophobia once or twice a week (R. at 260, 263).

Dr. Gaffney noted that when Plaintiff had a migraine headache, he

recommended she lie down, and avoid light and noise (R. at 261).  The doctor

further assessed that when Plaintiff was experiencing a migraine, her abilities

to interact normally with people, participate in conversation, look at a

computer screen, and stand or walk would be impaired.  Id.  He noted that

Plaintiff had "mild improvement" from her medications, but also recorded that

irregular ingestion of medications would aggravate Plaintiff's migraine

condition (R. at 262, 263).  This is the last medical record contained in

Plaintiff's file.

The ALJ assessed Plaintiff capable of performing her past relevant work as a cashier or hotel housekeeper based on the totality of evidence presented by her treating physicians, consulting physicians, test results, and the opinions of a State agency examining physician and a State agency examining psychologist.  Plaintiff's physical examinations, including neurological tests, and motor, sensory, and strength examinations were consistently normal, or showed modest findings (R. at 157-263).  Repeated MRIs of Plaintiff's brain showed no change in the size of the colloid cyst in the foramen of Monro, and no change in the lipoma over the vermis of Plaintiff's cerebellum (R. at 165-166, 167, 185-186, 223, 258).  While Plaintiff's medical record contains documentation of severe scoliosis in her thoracic and lumbar spine, physical examinations revealed this condition did not cause abnormal gait or station or other physical movement, or problems with Plaintiff's diaphragm, chest wall, lungs, or heart (R. at 171-176,177,184,193-194,197, 198).

With respect to Plaintiff's migraine headaches, she was treated successfully with amitriptyline by Dr. Haas, who reported on November 5, 2003 that Plaintiff had had only one headache since October 8, 2003 (R. at 164).  The doctor went on the note that "for the one headache, [Plaintiff] took a 12.5 mg almotriptan tablet and got good relief.  She is no longer hypersensitive to brightness and has been fully active at home with her two kids."  Id.  Dr. Haas revised his diagnosis from migraine with aura to "migraine without aura, now largely prevented from occurring by amitriptyline" (R. at

161, 162, 163, 164).  While Plaintiff was supposed to follow up with Dr. Haas

in the spring of 2004, she did not return to his office for further treatment (R.

at 164).  Instead, two years later, on November 30, 2005, Plaintiff was re-

evaluated by Dr. Gaffney (R. at 240-241).  She reported that she "ran out of

medicine" sometime after her last visit with Dr. Haas, and that the frequency

and severity of her migraine headaches had increased (R. at 240).  Plaintiff

treated her headache symptoms with over-the-counter naproxen.  Id.  Dr.

Gaffney noted Plaintiff's physical, neurological, motor, and mental

examinations were unremarkable (R. at 240-241).  He recommended Plaintiff

begin taking amitriptyline again, as well as Axert for severe headaches (R. at

241).  Dr. Gaffney opined Plaintiff was not permanently and totally disabled by

migraines, and that there was "certainly some chance we can get them back

under control again."  Id.  He then completed Medical Source Statements of

Plaintiff's physical and mental residual functional capacities and assessed her

as having no mental disabilities that would prevent her from performing work-

related activities, and no physical disability from migraine headaches that

would prevent her from performing work-related activities (R. at 242-244, 246-

249).  However, Dr. Gaffney did recommend Plaintiff undergo another

scoliosis study (R. at 249).

Thus, it is as puzzling to the Court as it must have been to the ALJ,

when on February 14, 2006, absent any other medical evidence from

examinations performed between December 1, 2005 and February 14, 2006,

Dr. Gaffney answered questions on a questionnaire created by Plaintiff's

attorney that, at first blush, appear to contradict his opinions contained in the
November 30, 2005 report of his examination of Plaintiff, as well as the
Medical Source Statement of Ability to Do Work-Related Activities (Physical)
completed after that examination (R. at 240-241, 246-249).  However, upon
closer examination of Plaintiff's medical record and the questions that were
asked of the doctor, it appears to the Court that Dr. Gaffney simply answered
the questions with the self-reported symptomatology Plaintiff provided to him
on November 30, 2005 (R. at 240-241, 260-263).  As an example, Plaintiff
reported to the doctor that she gets "a severe headache one to two days per
week.  For the severe headaches she has to lie down in a dark room and has
vomiting about one day per week.  Bad headaches typically will last all day.
The longest she will go without a headache is two days" (R. at 240).  On the
questionnaire, Dr. Gaffney checked the boxes that noted Plaintiff had severe
pain from migraine headaches one to two times per week, experienced
nausea or vomiting caused by migraines one to two times per week, and had
photophobia caused by migraines one to two times per week (R. at 260).  He
also checked the boxes that suggested Plaintiff had severe pain, nausea
and/or vomiting, and photophobia caused by migraines from four to more than
six hours per attack (R. at 260-261).  Interestingly, Dr. Gaffney opined that
Plaintiff's scoliosis, eye strain/poor vision, and colloid cyst in the foramen of
Monro had no effect on her headaches (R. at 263).

Given the appearance of somewhat contradictory information
contained in the Medical Source Statement of Ability to Do Work-Related

Activities (Physical) provided by Dr. Gaffney, and his answers to questions in a questionnaire created by Plaintiff's attorney, the Court finds it was not improper for the ALJ to give little weight to the answers on the questionnaire when making his determination that Plaintiff was not under a disability during the time frame relevant to her claim (R. at 26).

The ALJ did not base his assessment of Plaintiff's residual functional capacity on Dr. Gaffney's Medical Source Statements of November 30, 2005, while ignoring later evidence that might lead to the conclusion that Plaintiff was under a disability during the time frame relevant to her claim, as she alleges (R. at 242-244, 246-249, 260-263).  See also Plaintiff's Brief, pp. 5-10.  Rather, the ALJ's assessment was supported by the detailed examination reports of Doctors Pollack, Haas, Gaffney, and Weitzen (R. at 161-164, 165-167, 185-186, 188-192, 193-195, 240-249, 250-257, 258, 260-263).  An ALJ will afford controlling weight to a treating physician's opinion concerning the nature and severity of a claimant's impairment, or combination of impairments, when that opinion "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  See 20 C.F.R. § 404.1527(d)(2).  In this matter, the answers provided by Dr. Gaffney on the questionnaire were unsupported by any additional medical evidence entered into Plaintiff's record following his thorough examination of Plaintiff, and his Medical Source Statements, completed on November 30, 2005 (R. at 240-249).  Thus, the Court finds the ALJ did not err when giving the questionnaire

completed by Dr. Gaffney on February 14, 2006, little weight in the decision-making process (R. at 26, 260-263).  It is the sole responsibility of the ALJ to weigh all of the medical evidence and resolve any material conflicts in the record.  See Richardson v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971).  The ALJ appropriately afforded little weight to Dr. Gaffney's answers to Plaintiff's questionnaire, which were marked with inconsistency and lacked clinical support, than he afforded to Dr. Gaffney's Medical Source Statements of November 30, 2005, which were based on a thorough physical examination of Plaintiff, as well as reviews of Plaintiff's treatment notes from prior visits with him, with Dr. Haas, and with Dr. Pollack (R. at 240-249).

Plaintiff further complains that, in his decision, the ALJ failed to explain with sufficient specificity his reasons for giving little weight to Dr. Gaffney's answers to the questions contained in Plaintiff's questionnaire (R. at 26, 260-263).  See also Plaintiff's Brief, pp. 5-7.  She points out that the ALJ noted he gave "little weight" to the opinions as reflected in the questionnaire because "it is so inconsistent with [Dr. Gaffney's] prior opinions. Greater weight is given his prior opinions which are supported by the medical evidence of record" (R. at 26).  See also Plaintiff's Brief, p. 6.  Plaintiff alleges that because the ALJ was not more specific about what facts in the record he found to be inconsistent, she is unable to argue on appeal that the rejected evidence is, in fact, consistent with the substantial evidence of record.  See Plaintiff's Brief, p. 7.

The Court disagrees with Plaintiff's claim that the ALJ was not sufficiently specific in his decision about why he gave Dr. Gaffney's answers to Plaintiff's questionnaire "little weight" (R. at 26).  The ALJ provided sufficient reasoning in the body of his decision such that Plaintiff could frame a counter-argument on appeal.  As an example, the ALJ noted that in a report of contact with Plaintiff's mother on April 7, 2005, the mother disclosed amitriptyline was helpful for Plaintiff's headaches, and the "headaches are less frequent" (R. at 23, 24, 26, 112).  The ALJ summarized office notes prepared by Doctors Haas and Gaffney that reported Plaintiff's headaches were "largely prevented from occurring by amitriptyline," but when Plaintiff stopped seeing Dr. Haas and ran out of medicine, "her headaches have been pretty bad ever since"  (R. at 24, 164, 240).

Within the body of his decision, the ALJ reviewed medical evidence offered by Plaintiff's neurosurgeon, Dr. Pollack, which suggested Plaintiff's colloid cyst and benign lipoma over the vermis of her cerebellum were stable, did not cause abnormal results in her neurological examinations, and were not "severe" impairments under the Act because they did not cause a significant restriction in Plaintiff's ability to perform basic work activities (R. at 23, 165-166, 167, 170, 185-186, 187, 258).  Further, the ALJ reviewed within the body of his decision the medical evidence offered by State agency examining physician Dr. Henderson, and State agency examining psychologist Dr. Weitzen (R. at 23, 25, 26).   He explicitly summarized the

evidence of both examiners, and described how he weighted that evidence. Id.

The ALJ also examined Plaintiff's credibility and subjective testimony, and while he found that Plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, her statements concerning the intensity, duration, and limiting effects of her symptoms were not entirely credible (R. at 24). The ALJ summarized Plaintiff's reported symptoms, frequency of occurrence, her daily activities, her types and dosages of medications and other remedies she used to relieve her symptoms, and her general medical history (R. at 24-26). The ALJ exercised his discretion to evaluate the credibility of Plaintiff's testimony, presented an explicit summary of his evaluation, and rendered an independent judgment regarding the extent of Plaintiff's subjective complaints based on the objective medical and other evidence (R. at 25). See e.g. Mimms v. Sec'y of Health and Human Servs., 750 F.2d 180, 196 (2d Cir. 1984).

Thus, the Court finds that—contrary to Plaintiff's assertion that the ALJ did not provide sufficient reasoning such that she could determine why the ALJ found Dr. Gaffney's answers to her questionnaire inconsistent with other facts contained in the record—the ALJ's decision clearly sets forth his reasoning with his explicit evaluation of the evidence and his weighting of various opinions and Medical Source Statements. The ALJ met the burden imposed by SSR 96-2p by providing specific reasons as to why he gave more

weight to Dr. Gaffney's opinions as reflected on the doctor's Medical Source Statements of November 30, 2005, over the doctor's answers to Plaintiff's February 14, 2006 questionnaire, and these reasons were supported by the ALJ's evaluation of the evidence contained within the record (R. at 23-26).

### Plaintiff's Second Challenge: The ALJ Erred by Concluding She Could Engage in Substantial Gainful Activity

12.    Plaintiff's second allegation is that the ALJ erred when he concluded she could engage in substantial gainful activity because he did not consider how Plaintiff's exertional and non-exertional impairments would limit her return to her past relevant work, and he did not consider that Plaintiff's limitations would prevent her from working on a regular and continuing basis. Plaintiff argues that the ALJ did not properly consider Plaintiff's residual functional capacity, as required by the five-step sequential evaluation process, and he did not consider how her limited residual functional capacity would impact the type and nature of jobs available to her.  See Plaintiff's Brief, pp. 10-15.

The Court disagrees with Plaintiff's second challenge.  As discussed at length in section 11 above, the ALJ carefully examined Plaintiff's medical and other evidence, and concluded at step two of the sequential evaluation that Plaintiff had the severe impairments of migraine headaches and scoliosis, but that her colloid cyst and benign lipoma over the vermis of her cerebellum were not severe impairments within the meaning of the Act (R. at 23).  See 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); see also Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The ALJ then proceeded to

step three of the sequential evaluation, and determined that Plaintiff's severe impairments did not meet or medically equal the criteria of a listed impairment at 20 C.F.R. Part 4, Subpart P, Appendix 1 (R. at 23).  Id.  At step four of the sequential evaluation, the ALJ evaluated Plaintiff's residual functional capacity given her severe impairments, as well as her past relevant employment, and determined that she retained the residual functional capacity to return to her past relevant employment as a cashier or as a hotel housekeeper, and to perform that work as it is actually and generally performed (R. at 24-27).  Id.  Because the ALJ assessed Plaintiff as capable of returning to her past relevant employment, the burden did not shift to the Commissioner to determine if, given Plaintiff's severe impairments, she was capable of making an adjustment to other work that exists in the national and local economies.  Id.

As required by the Commissioner's regulations, the ALJ carefully considered the medical and other evidence, including opinion evidence, in Plaintiff's record when determining that she was not under a disability as defined by the Act, and that she retained the residual functional capacity to return to her past relevant work (R. at 24-27).  See 20 C.F.R. §§ 404.1527 and 416.927, 404.1529 and 416.929; SSR 96-2p, SSR 96-4p, SSR 96-5p, SSR 96-6p, and SSR 96-7p.  Plaintiff disputes this finding and asserts that the ALJ did not properly consider her combination of exertional and non-exertional impairments.  See Plaintiff's Brief, pp.11-13.  Without belaboring all of the medical and other evidence discussed in section 11 above, the Court

points out that many of Plaintiff's physical, neurological and mental evaluations revealed normal or minimal results.  As an example, Plaintiff's physical examination by a State agency examining physician, Dr. Henderson, was unremarkable and the doctor opined Plaintiff had only a moderate restriction for sustained work activity, and only a mild restriction for heavy lifting and carrying (R. at 171-176).  Plaintiff's treating physician, Dr. Gaffney, examined her on several occasions and opined she had no limitations from her migraine headaches that would render her either physically or mentally disabled (R. at 240-249).  State agency examining psychologist, Dr. Weitzen, opined Plaintiff would have slight limitations when interacting with the public, co-workers, and supervisors, and moderate limitations with work pressures or changes to routines in a work setting, but assessed her as having no mental impairment that would affect her ability to understand, remember, and carry out instructions in a work-related setting (R. at 255-256).  The Court recognizes that some of the evidence in Plaintiff's record may be susceptible to more than one rational interpretation.  However, when the evidence is examined as a whole, it would allow a reasonable mind to accept the conclusions reached by the ALJ, and thus these findings must be upheld. See Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982); Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982, cert. denied, 459 U.S. 1212 (1983).

Based upon the consideration of all of the evidence in Plaintiff's record, the Court finds the ALJ properly determined that Plaintiff was not under a disability as defined by the Act, and retained the residual functional

capacity to return to her past relevant work as a cashier or as a hotel housekeeper.

> **Plaintiff's Third Challenge: The Testimony of a Vocational Expert Was Required to Determine If Plaintiff Can Do "Other Work"**

13.     Plaintiff challenges the decision of the ALJ on the basis that he did not engage the services of a vocational expert to determine if Plaintiff can do work other than her past relevant work, given that she claims significant non-exertional limitations that would prevent her from returning to her prior jobs as a cashier or hotel housekeeper. See Plaintiff's Brief, pp. 15-16.  Plaintiff cites two cases, Pratts v. Chater and Bapp v. Bowen that set forth the principle that if a claimant's work capacity is significantly diminished beyond that caused by his or her exertional impairment(s), then the use of the grids [Medical Vocational Guidelines] is an inappropriate method of determining a claimant's residual functional capacity.  See Plaintiff's Brief, pp. 15-16; see also Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604-605 (2d Cir. 1986).  Plaintiff claims that because the burden is on the Commissioner to show that there are jobs in the national and local economies available to her given her non-exertional limitations, the ALJ could meet this burden only by introducing testimony from a vocational expert.  See Plaintiff's Brief, pp. 16-17.

        The Court disagrees with Plaintiff's third challenge to the ALJ's decision.  As discussed in section 12 above, while the ALJ identified Plaintiff's migraine headaches and scoliosis as severe impairments, the medical and

other evidence did not lead to the conclusion that the signs and symptoms of these impairments were of such disabling intensity that Plaintiff could perform neither her past relevant work, nor, considering her age, education and work history, any work available in the national and local economies (R. at 24-27). Further, when assessing Plaintiff's residual functional capacity, the ALJ did not find that she had any significant non-exertional limitations that would preclude her from performing her past relevant work as a cashier or hotel housekeeper.  Id.  Because the ALJ found Plaintiff capable of returning to her past relevant work at step four of the sequential evaluation, he was not required to proceed to step five of the sequential evaluation to consider vocational factors such as age, education, and work experience.  See 20 C.F.R. §§ 404.1560 and 416.960; see also Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982).  Thus, the Court finds the ALJ did not err by determining that Plaintiff could return to her past relevant work absent the testimony of a vocational expert.

## Conclusion

14.     After carefully examining the administrative record, the Court finds substantial evidence supports the ALJ's decision in this case, including the objective medical evidence and supported medical opinions.  It is clear to the Court that the ALJ thoroughly examined the record, afforded appropriate weight to all the medical evidence, including Plaintiff's treating physicians, consultative examiners, and State agency medical consultant, and afforded Plaintiff's subjective claims of pain and limitations an appropriate weight when

rendering his decision that Plaintiff is not disabled.  The Court finds no reversible error and, further finding that substantial evidence supports the ALJ's decision, the Court will grant Defendant's Motion for Judgment on the Pleadings and deny Plaintiff's motion seeking the same.

IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is denied.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge

Dated:  January 15, 2009

Syracuse, New York